**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
)
DEPARTMENT OF MEDICAL ASSISTANCE    )
   SERVICES OF THE COMMONWEALTH    )
   OF VIRGINIA    )
600 E. Broad Street    )
Richmond, VA 23219    )
                  )
       Plaintiff,    )
                  )
   v.    )    Case No. _____
                  )
UNITED STATES DEPARTMENT OF    )
   HEALTH AND HUMAN SERVICES,    )
200 Independence Avenue, S.W.    )
Washington, D.C. 20201,    )
                  )
       and    )
                  )
SYLVIA MATHEWS BURWELL, Secretary,    )
   U.S. Department of Health and    )
   Human Services,    )
200 Independence Avenue, S.W.    )
Washington, D.C. 20201,    )
                  )
       Defendants.    )
_____)

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff Department of Medical Assistance Services of the Commonwealth of Virginia

("Virginia" or "DMAS") hereby files this Complaint against defendants United States

Department of Health and Human Services ("HHS") and Sylvia Mathews Burwell in her official

capacity as Secretary of HHS (collectively, "HHS" or "Agency").

## JURISDICTION

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and

1361.  Venue is proper under 28 U.S.C. § 1391(e).  The declaratory and injunctive relief sought

in this action is authorized by 28 U.S.C. §§ 2201-2202.  Judicial review of HHS's action is

authorized under 5 U.S.C. §§ 701-706, and Virginia has exhausted all available administrative remedies.

## PARTIES

2.      Plaintiff, the Department of Medical Assistance Services or "DMAS," is the "Single State Agency" designated by the Commonwealth of Virginia to administer the Commonwealth's Medicaid and Children's Health Insurance ("CHIP") Programs as required by 42 C.F.R. § 431.10 (hereinafter "Medicaid").

3.      Defendant HHS is charged with the administration of the federal Medicaid and CHIP programs authorized under Title XIX of the Social Security Act (42 U.S.C. §§ 1396 *et seq*.).  Within HHS, the Centers for Medicare and Medicaid Services ("CMS") administers these programs.

4.      Defendant Sylvia Mathews Burwell is the Secretary of HHS and is therefore the official within the Executive Branch of the United States government ultimately responsible for carrying out the programs and activities of that Department.  She is sued in her official capacity.

## LEGAL BACKGROUND

### *The Medicaid Program*

5.      The Medicaid program, authorized under Social Security Act §§ 1900, *et seq.* (the "SSA"), makes health care services available to needy individuals and families whose resources are insufficient to meet the costs of necessary medical services.  *See* SSA § 1901, 42 U.S.C. § 1396-1(1).  Medicaid is jointly supported by state funds and federal matching funds known as federal financial participation ("FFP").

6.      A State that elects to participate in Medicaid must submit and obtain approval of a State Medicaid plan, through which the State defines, among other things, groups of individuals covered, eligibility conditions, medical care and services, payment, and federal-State

requirements. *See generally* SSA § 1902(a)(1)-(65), 42 U.S.C. §§ 1396a(a)(1)-(65), and 42

C.F.R. Part 430 *et seq.* A state plan "must describe the policy and methods to be used in setting

payment rates for each type of service included in the State's Medicaid program." 42 C.F.R. §

447.201(b).

*Disproportionate Share Hospital Payments*

7.     In 1981, Congress amended the SSA so that States were no longer required to pay

hospitals by reimbursing them for their reasonable costs. Pub. L. No. 97-35 § 2173, 95 Stat 357,

808 (1981). Instead, each State had flexibility to develop its own inpatient hospital payment

methodologies. *Id.* At the same time, Congress recognized that "public hospitals and teaching

hospitals which serve a large Medicaid and low income population are particularly dependent on

Medicaid reimbursement" and feared that the amendment would negatively affect such hospitals.

H.R. Conf. Rep. 97-208, 962, 1981 U.S.C.C.A.N. 1010, 1324. To remedy the problem,

Congress required States, in devising payment rates, to "take into account . . . the situation of

hospitals which serve a disproportionate number of low-income patients with special needs."

Pub. L. No. 97-35 § 2173, 95 Stat. 357, 808 (1981) (amending SSA § 1902(a)(13), 42 U.S.C. §

1396a(a)(13)).

8.     Congress passed an amendment to the SSA in 1987 that required States to

describe a Disproportionate Share Hospital ("DSH") payment methodology in their State plans.

Pub. L. No. 100-203 § 4112 [SSA § 1902(a)(13) note, 42 U.S.C. § 1396a(a)(13) note], 101 Stat.

1330, 1330-148 (1987).

9.     In describing the DSH payment methodology, States were permitted to create a

formula that was "reasonably related to the costs, volume, or proportion of services provided to

patients eligible for medical assistance under a State plan . . . or to low-income patients." Pub. L.

No. 101-508 § 4703, 104 Stat. 1388, 1388-171 (1990); SSA § 1923(c)(3), 42 U.S.C. § 1396r-

4(c)(3).  Congress also permitted States to develop different DSH payment methodologies for

different types of hospitals.  *Id.*

*The DSH Statewide Allotment*

10.     In 1991, Congress placed a cap on the amount of FFP in DSH payment

adjustments.  Specifically, the Medicaid Voluntary Contributions and Provider-Specific Tax

Amendments of 1991 ("the Provider Tax Amendments") provided for (1) the calculation of a

statewide allotment and (2) a prohibition against FFP in DSH payment adjustments that

exceeded the statewide allotment.  Pub. L. No. 102-234 § 3, 105 Stat. 1793, 1799-1805 (1991)

(adding SSA § 1923(f), 42 U.S.C. § 1396r-4(f)).

11.     Congress directed CMS to calculate a "base allotment" for each State for fiscal

year 1993.  *Id.*  The base allotment was defined as the greater of "the total amount of payment

adjustments made under subsection (c) under the State plan during fiscal year 1992" or

$1,000,000.  *Id.*

12.     In implementing the base allotment, CMS defined the base allotment as the

greater of "the total amount of the State's projected DSH payments for Federal fiscal year 1992

under the State plan applicable to Federal fiscal year 1992" or $1,000,000.  42 CFR §

447.298(a).

13.     CMS's interpretation is important to this dispute for two reasons.  First, CMS tied

the base allotment to *projected* DSH payments *under the State Plan*.  By doing so, CMS

recognized that a State's DSH payment methodology could be prospective and could take a

number of forms because of the flexibility States had to define a unique DSH payment

adjustment formula.  In response to a commenter's suggestion that the base allotment be

associated with a fiscal year based on the date when services were rendered that gave rise to the

DSH payment adjustment, CMS stated: "Since DSH payments are not necessarily directly tied to

4

services, we believe that including the word 'services' would cause considerable confusion." 58 Fed. Reg. at 43,178.

14.     Second, CMS recognized that many States paid DSH payment adjustments in installments over time.  In other words, even if a State's formula authorized a certain DSH payment adjustment amount for a disproportionate share hospital in fiscal year 1992, part of that amount may actually be paid during a subsequent fiscal year.  CMS therefore interpreted Congress's intent in setting the initial allotment as not "limit[ing] DSH payments based on actual cash payments made *in* [fiscal year] 1992," but instead limiting them on the basis of DSH payment adjustments "*applicable* to FFY 1992."  58 Fed. Reg. at 43,173-74 (emphasis added).

15.     In the final rule, CMS also explicitly condoned the practice of paying DSH payment adjustments in installments over several fiscal years:  "If a State's actual DSH expenditures applicable to a Federal fiscal year are less than its final State DSH allotment for that Federal fiscal year, the State is permitted, to the extent allowed by its approved State plan, to make additional DSH expenditures applicable to that Federal fiscal year up to the amount of its final DSH allotment for that Federal fiscal year."  42 CFR § 447.297(d)(3).

*The Hospital-Specific Limit*

16.     In 1993, Congress amended the law again to impose an additional limitation on DSH payment adjustments: payments to each hospital "may not exceed the costs incurred during the year" of furnishing hospital services to Medicaid patients and uninsured patients.  Pub. L. No. 103-66, §13621, 107 Stat. 312, 629-32 (1993) (codified at SSA § 1923(g)(1)(A), 42 U.S.C. § 1396r-4(g)(1)(A)).  These costs are commonly referred to as uncompensated care costs.  The cap became known as the "hospital-specific limit."

17.     A decade later Congress required States to obtain certified audits to verify whether DSH payment adjustments were within the hospital-specific limits.  Pub. L. No. 108-173 § 1001, 117 Stat. 2066, 2428-31 (codified at SSA § 1923(j), 42 U.S.C. § 1396r-4(j)).

18.     In the preamble to the final regulations implementing the DSH audit requirement, CMS emphasized two further points important to this dispute.  First, CMS clarified that "the hospital specific limit is not a payment methodology," but instead, a limitation overlaid on the State plan DSH payment methodology.  CMS, Final Rule, Medicaid Program; Disproportionate Share Hospital Payments, 73 Fed. Reg. 77,904, 77,906 and 77,910 (Dec. 19, 2008).  In other words, nothing in the new regulation was intended to require that States adopt a retrospective DSH payment methodology that reimburses hospitals for specific uncompensated care costs. *Id.* at 77,928, 77,934, 77,944.

19.     Second, because States had never before been required to settle their DSH payment adjustments based on audited uncompensated care costs, CMS created a safe harbor for fiscal years 2005 through 2010: "findings of State reports and audits for Medicaid State Plan years 2005-2010 will not be given weight except to the extent that the findings draw into question the reasonableness of State uncompensated care cost estimates used for calculations of prospective DSH payments for Medicaid State plan year 2011 and thereafter."  42 CFR § 455.304(e).

## STATEMENT OF FACTS

*Virginia's State Plan*

20.     During all the times relevant to this appeal, Virginia's State plan provided: "Payments to disproportionate share hospitals (DSH) shall be prospectively determined in advance of the year to which they apply." ***Exhibit 1*** [State Plan Attachment 4.19-A, State Plan Transmittal No. 03-08, effective August 13, 2003] at 10.  The State plan set forth a formula,

based on variables such as the hospital's Medicaid utilization percentage, the hospital's Medicaid operating reimbursement, and a multiplier, for calculating a DSH payment adjustment for each hospital that was applicable to the ensuing fiscal year. *Id.*

21.     The State Plan provided that the prospectively calculated DSH amount "shall not be subject to settlement except when necessary due to the limit in subsection D of this section." *Id.* [State Plan Attachment 4.19-A, State Plan Transmittal No. 03-08, effective August 13, 2003] at 10.1.  Subsection D, in turn, provided that DSH payment adjustments would not exceed limitations imposed by federal law. *Id.* [State Plan Attachment 4.19-A, State Plan Transmittal 04-13, effective April 1, 2005] at 11.

22.     Virginia's State plan recognized two types of hospitals: Type One hospitals, which are State-owned teaching hospitals; and Type Two hospitals, which are all other hospitals. *Id.* [State Plan Attachment 4.19-A, State Plan Transmittal No. 09-17, effective July 1, 2009] at 5.

23.     Only two hospitals qualify as Type One under the State plan standards: University of Virginia ("UVA") and Virginia Commonwealth University – Medical College of Virginia ("MCV").

24.     During the time period at issue, the State plan provided for calculating DSH payment adjustments to Type One and Type Two hospitals according to the same formula, but for Type One hospitals the formula amount was multiplied by seventeen. *Id.* [State Plan Attachment 4.19-A, State Plan Transmittal No. 03-08, effective August 13, 2003].

25.     The multiplier was designed to maximize the DSH payment adjustment available for UVA and MCV because of the critical role that these hospitals play in serving Medicaid and uninsured patients.

26.     CMS approved Virginia's DSH payment methodology. *Id.*

*Virginia's Practice*

27.     DMAS's practice from 1992 forward was to use the formula in the State plan to prospectively calculate a DSH payment adjustment for each hospital for the ensuing fiscal year. DMAS sent a letter to each disproportionate share hospital notifying it of the amount derived under the formula.  *See **Exhibits 2-3***.  The letters stated: "DSH payments are fully prospective amounts determined in advance of the State fiscal year to which they apply and shall not be subject to revision based on changes in utilization during the year to which they apply."  *Id.*

28.     DMAS paid its DSH payment adjustments to UVA and MCV in the form of installment payments consisting of "regular" payments and "enhanced" payments.  Regular DSH disbursements consisted of one seventeenth of the total DSH payment adjustment authorized under the State plan and were paid during the fiscal year to which the DSH payment adjustment applied.  Enhanced DSH disbursements made up the difference between the regular DSH disbursements and the full DSH payment adjustment, subject to federal limits.  Enhanced DSH amounts were often disbursed in multiple discrete payments over several fiscal years.

29.     As DMAS paid ongoing installments of enhanced DSH payments, DMAS charged the payments, as directed by the State plan, to a fiscal year in which (1) the full amount of the DSH payment adjustment, as calculated prospectively under the State plan, had not been exhausted, (2) the contemplated payment complied with the hospital-specific limit as implemented by CMS, and (3) the contemplated payment would not cause Virginia to exceed its allotment.

30.     Prior to 2004, to determine when and in what amount to disburse an "enhanced" DSH installment to UVA and MCV, DMAS also considered several factors, including estimated costs that the hospitals had incurred in serving indigent and medically indigent persons pursuant

to Virginia's indigent care policy, as well as adjustments to regular Medicaid inpatient hospital reimbursements resulting from the application of the upper payment limit.

31.     In 2004, DMAS began conducting an informal "multi-settlement" process under which DMAS evaluated both the Medicaid cost report and cost reports for Medicaid managed care organization (MCO) services and indigent care as a whole in regard to the state indigent care policy.

32.     After 2004, DMAS considered the multi-settlement process to determine when and in what amount to make an "enhanced" DSH installment.  This was a modification to Virginia's internal procedures.  Virginia continued to comply with the federal limits on DSH payments in the same way that it had before.

33.     DMAS maintained an internal spreadsheet documenting each disbursement of DSH adjustments and the allotment year to which it applied.  When DMAS claimed FFP through its Quarterly Statement of Expenditures (CMS-64) for DSH disbursements, information from the internal DSH spreadsheet was transferred to the CMS-64.9 D form.  *Exhibits 4-6*.  DMAS also documented on the CMS-64.9 D form the allotment year to which each DSH disbursement applied.  *Id.*

*The 2002 Appeal*

34.     In 2002, CMS disallowed FFP in certain DSH payments on the basis that Virginia had violated the timely claiming rule (45 C.F.R. § 95.7).  CMS argued that Virginia's State Plan prohibited Virginia from paying the DSH payment adjustment in installments over time because the State Plan said that DSH payments made during the fiscal year would be "final".  CMS imputed payments in later fiscal years to the fiscal year to which they applied and disallowed FFP for these payments on the basis of the timely claiming rule.  *Virginia Dep't of Med. Assistance Servs.*, DAB No. 1838, 2002 WL 20131569 at *1 (August 2, 2002).

35.     Virginia argued that the term "final" was ambiguous when combined with the provision of the State plan that authorized payments to be made in accordance with federal limits.  Virginia interpreted its State plan to allow DMAS to make DSH disbursements during the fiscal year to which the payments applied and after the fiscal year to which the payments applied, once Virginia had more information about what the federal limits for that year would be. *Virginia Dep't of Med. Assistance Servs.*, DAB No. 1838, 2002 WL 20131569 at *passim* (August 2, 2002).

36.     The Board found that Virginia's interpretation was reasonable.  *Virginia Dep't of Med. Assistance Servs.*, DAB No. 1838, 2002 WL 20131569 at *9 (August 2, 2002).  If Virginia were required to pay the total prospectively calculated amount at once, Virginia may be forced to recoup significant amounts of money from hospitals and repay significant amounts of FFP.  *Id.* That result was inconsistent with the interests of federal and state taxpayers.  *Id.*  The Board also noted that because the allotment was a hard limit on statewide DSH spending, there was no danger that CMS would be surprised by disbursements made over several fiscal years.  *Id.* at *8.

*The Disallowance*

37.     Not content to live with the Board's 2002 decision, by letter received September 30, 2010, CMS notified DMAS of a deferral of DMAS's request for $16,560,340 in FFP for DSH disbursements claimed on the CMS-64 for the quarter ending (QE) June 30, 2010.  ***Exhibit 7***.  The letter explained that FFP had been deferred because DMAS's payments to UVA and MCV "were not matched to the State's DSH allotments applicable to the year in which the services were performed."  *Id.* at 1.

38.     CMS did not explain in the letter the factual basis for concluding that the payments were not appropriately "matched" to specific services.  It appears that CMS reached this conclusion because, on the internal spreadsheet that DMAS maintained as backup for the

10

Form CMS-64.9 D worksheet, DMAS had included, beside certain DSH disbursements, references to a year other than the allotment year that was identified with the payment on the worksheet.  *See Exhibit 8*.  These references indicated that DMAS had taken information from the "multi-settlements" from those years into consideration in determining when and in what amount to make a disbursement of enhanced DSH amounts due to UVA or MCV.  The annotations were made for DMAS's internal record-keeping.

39.     CMS deferred an additional $17,529,646 in FFP for DSH disbursements to UVA and MCV claimed for QE September 30, 2010, relying on the same theory.  *Exhibit 9*.

40.     CMS issued a disallowance in the amount of $40,830,020 FFP on August 20, 2015.  *Exhibit 10*.  The disallowance included portions of the deferred amounts for QEs June 30 and September 30, 2010 (net of certain adjustments), as well as new disallowed amounts of $14,138,519 FFP for QEs September 30, 2011 and December 31, 2011.  *Id.*  CMS stated in the disallowance letter:

> In reviewing documentation of DSH payments made on the CMS-64 expenditure reports for the four quarters at issue, CMS found that the State was not allocating payments to the proper DSH FY allotment.  As noted above, payments for FY 2004 costs were applied against the FY 2006 and FY 2009 DSH allotments; payments for FY 2005 costs were applied against the FY 2006 DSH allotment; payments for FY 2008 costs were applied against the FY 2006, FY 2007, FY 2009 and FY 2010 allotments; and payments for FY 2009 costs were applied against the FY 2008, FY 2011, and FY 2012 allotments.

*Id*. at 3.

41.     CMS stated repeatedly in the letter, without citing authority in support of this proposition, that DSH disbursements must be "allocated to the time periods in which DSH-eligible costs were incurred by the hospitals in providing certain services."  *Id*. at 4.  In fact, CMS has made clear in its rulemaking that DSH disbursements are *not* required to be associated with specific costs or specific services.

42.     The disallowance covered FFP in DSH disbursements Virginia reported for

quarters ending June 30, 2010, September 30, 2010 and September 30, 2011.  For the quarter

ending June 30, 2010, CMS disallowed FFP in the following DSH disbursements:

| Disallowed Payment | FFP | Allotment Year |
|---|---|---|
| $1,676,546 | $838,273 | 2006 |
| $766,324 | $383,162 | 2006 |
| $1,286,904 | $643,452 | 2006 |
| $675,906 | $337,953 | 2006 |
| $1,400,000 | $700,000 | 2006 |
| $5,993,748 | $2,996,874 | 2007 |
| $4,735,000 | $2,367,500 | 2007 |
| $1,789,648 | $894,824 | 2009 |

*Ex. 7*.

43.     For the quarter ending September 30, 2010, CMS disallowed FFP in the following

DSH disbursements:

| Disallowed Payment | FFP | Allotment Year |
|---|---|---|
| $22,476,724 | $11,238,362 | 2010 |
| $12,582,204 | $6,291,102 | 2010 |

*Ex. 9.*

44.     For the quarter ending September 30, 2011, CMS disallowed FFP in the following

DSH disbursements:

| Disallowed Payment | FFP | Allotment Year |
|---|---|---|
| $6,331,083 | $3,165,542 | 2011 |
| $340,994 | $170,497 | 2008 |
| $19,477,649 | $9,738,825 | 2011 |

*Ex. 10.*

45.     For the quarter ending December 31, 2011, CMS disallowed FFP in the following

DSH disbursement:

| Disallowed Payment | FFP | Allotment Year |
|---|---|---|
| $2,127,311 | $1,063,656 | 2012 |

*Ex. 10*.

46.     Subsequent to the disallowance, Virginia's DSH audit findings for State Plan Year 2011 disclosed DSH disbursements to UVA that exceeded the hospital-specific limit.  As a result, DMAS recouped from UVA a DSH payment adjustment in the amount of $36,686,670 that had been applied to the DSH statewide allotment for fiscal year 2011.  Accordingly, on the CMS 64.9D for the quarter ending September 30, 2015, DMAS credited to CMS the FFP portion of the recoupment, which equaled $18,343,335.

47.     Similarly, DMAS recouped from UVA a DSH payment adjustment in the amount of $10,734,971 that had been applied to the DSH statewide allotment for fiscal year 2012.  Accordingly, on the CMS 64.9D for the quarter ending September 30, 2015, DMAS credited to CMS FFP in the amount of $5,367,486.

48.     These repayments exceeded the disallowed amounts (described in the chart above) that related to DSH disbursements to UVA for fiscal years 2011 and 2012.

*The Appeal*

49.     Virginia timely appealed the August 20, 2015 disallowance to the HHS Departmental Appeals Board (the "Board") on October 21, 2015.

50.     In the course of the appeal, Virginia argued that the DSH payment disallowance is erroneous as a matter of both law and fact.  Contrary to CMS's allegations in the disallowance, Virginia's DSH payments fully complied with the State plan and the statewide allotment.

51.     Virginia also argued that the disallowance should be reduced because Virginia had already repaid to CMS a portion of the disallowance.

*The Board's Decision*

52.     On August 8, 2016, the Board issued its decision upholding the full amount of the disallowance. ***Exhibit 11***.

53.     The Board's decision was arbitrary, capricious and contrary to law.

54.     Among other things, the Board ignored its own precedent when it faulted DMAS for using a DSH methodology that was required by the plain language of Virginia's State plan.

55.     The Board also misconstrued Virginia's 2002 interpretation as creating a retrospective methodology that required Virginia to apply DSH payments to the statewide allotment based on the year in which specific uncompensated costs were incurred.

56.     Moreover, the Board required that Virginia's DSH payments be associated with specific costs, even though Virginia had no prior notice of such a requirement and such a requirement is directly contrary to the DSH payment adjustment statute and implementing regulations.  In effect, the Board added a fourth DSH payment criteria of which Virginia had no notice.

57.     The Board also upheld the total amount of the disallowance without making any factual findings about whether Virginia had repaid a portion of the disallowance.

## CAUSES OF ACTION

### COUNT I

**ADMINISTRATIVE PROCEDURE ACT:**
**Agency Action as Arbitrary, Capricious, and/or Contrary to Law**

58.     Virginia realleges and incorporates by reference herein paragraphs 1 through 57, above.

59.     The decision upholding CMS's disallowance of $40,830,020 in FFP for DSH payments Virginia made to UVA and MCV is arbitrary, capricious and contrary to law in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A).

14

60.     The decision disregards and is contrary to the statute, implementing regulations, and prior rulings in administrative appeals binding on HHS.

## COUNT II

## ADMINISTRATIVE PROCEDURE ACT:
Agency Action as Arbitrary, Capricious, and/or Contrary to Law

61.     Virginia realleges and incorporates by reference herein paragraphs 1 through 57, above.

62.     The decision to uphold the total amount of the disallowance even though Virginia presented evidence that it already repaid a portion of it is arbitrary, capricious and contrary to law in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A).

63.     The decision disregards and is contrary to the statute, implementing regulations and prior rulings in administrative appeals binding on HHS.

## PRAYER FOR RELIEF

NOW, THEREFORE, Virginia requests that this Court:

A.     Declare that HHS's bases for disallowing the DSH payments to UVA and MCV are unlawful and arbitrary, capricious and contrary to law;

B.     Declare that the Board's decision to uphold the disallowance is itself unlawful and arbitrary and capricious;

C.     Reverse the HHS and Board disallowance decisions as they relate to Virginia's DSH payments or, in the alternative, vacate those decisions and remand to HHS with instructions to apply the correct legal standards and consider the relevant evidence of record;

D.     Award Virginia its costs and attorney's fees incurred in the prosecution of this action; and

E.     Grant such other relief as the Court deems warranted and just.

15

Respectfully submitted,

/s/ Edward T. Waters
Edward T. Waters (DC Bar No. 422461)
FELDESMAN TUCKER LEIFER FIDELL LLP
1129 20th Street, N.W., Fourth Floor
Washington, D.C. 20036
(202) 466-8960 (telephone)
(202) 293-8103 (facsimile)
ewaters@ftlf.com