UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DEPARTMENT OF MEDICAL )
ASSISTANCE SERVICES OF THE )
COMMONWEALTH OF VIRGINIA )
 )
      Plaintiff, )
 )
v. ) Civil Case No. 16-2008 (RJL)
 )
UNITED STATES DEPARTMENT )
OF HEALTH AND HUMAN )
SERVICES, )
 )
      and )
 )
ALEX M. AZAR II, Secretary, )
U.S. Department of Health and )
Human Services )
 )
      Defendants. )

FILED

SEP 3 0 2018

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

MEMORANDUM OPINION
(September 30, 2018) [Dkt. ## 22, 24]

Plaintiff Department of Medical Assistance Services of the Commonwealth of Virginia ("Virginia" or "plaintiff") brings suit against the United States Department of Health and Human Services ("HHS") and Secretary Alex M. Azar II (collectively, "defendants" or "the Government"), asking this Court to overturn a disallowance of roughly $30 million in federal financial participation ("FFP") payments to certain in-state disproportionate share hospitals ("DSH"). The gravamen of Virginia's complaint is that, in its administration of DSH funding under Medicaid, HHS has violated the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq. See* Compl. ¶¶ 58–63. Before this Court

1

are the parties' Cross-Motions for Summary Judgment. *See* Pl.'s Motion for Summary Judgment [Dkt. #22] ("Pl.'s Mot."); Defs.' Cross-Motion for Summary Judgment [Dkt. # 24] ("Defs.' Mot."). For the following reasons, the defendants' motion for summary judgment [Dkt. # 24] is GRANTED and plaintiff's motion [Dkt. # 22] is DENIED.

## BACKGROUND

### I. Statutory Framework

Title XIX of the Social Security Act (hereinafter, "the Medicaid Act" or "the Medicaid statute"), provides for joint federal and state financing of medical assistance for the benefit of aged, blind, or permanently disabled individuals and for the benefit of families with dependent children. *See* 42 U.S.C. §§ 1396–1396w-5. The dispute before the court arises from the complicated fiscal relationship between HHS—which Congress has empowered to administer spending under Medicaid—and states like Virginia, which Congress has long enticed with promises of matching federal funds. Therefore, a brief overview of the statutory scheme is an appropriate place to start.

To receive federal Medicaid funds, states are required to submit a State Plan to HHS—specifically, to the Centers for Medicare and Medicaid Services ("CMS")—for approval. 42 C.F.R. § 430.10; *see also* 42 U.S.C. § 1396a. The State Plan must "contain[] all information necessary for CMS to determine whether the plan can be approved to serve as a basis for Federal financial participation (FFP) in the State program." 42 C.F.R. § 430.10. States generally enjoy some flexibility in providing Medicaid services, and the State Plan is meant to spell out how the state accounts for its Medicaid-eligible expenditures, including the in-patient hospital services at issue in this case. 42 U.S.C. §

2

1396a(a)(3)(A). As with all federally-funded state matching programs, however, Congress puts limits on how states allocate and report their payment of Medicaid funds, and empowers HHS to monitor what the federal government is matching.

This case concerns reimbursement for disproportionate share hospitals ("DSH")—those that serve a disproportionate number of low-income patients. *See* 42 U.S.C. § 1396r-4(b), (d). States like Virginia, operating under a State Plan, spend heavily to reimburse such hospitals for providing Medicaid-covered services to the indigent, and then seek federal matching funds for those expenditures under Title XIX. Funding tracks the fiscal year, as in all other areas of the federal budget. *See* 42 U.S.C. § 1396r-4(f). Over time, Congress has imposed restrictions on the matching of, and thus federal funding for, state DSH expenditures, like those Virginia seeks recoupment for in this case. Two are relevant here. First, Congress mandates that DSH payments by a State "in a fiscal year" not exceed the combined state and federal DSH "allotment for the State for the fiscal year." 42 U.S.C. § 1396r-4(f)(1); *see also* 42 C.F.R. § 497.298. This is referred to as the "statewide allotment," and in practice, it amounts to a yearly cap for each state. Conventionally understood, statewide allotments are basically the "upper…limit[]" that the federal government will match funds for each state, and Congress uses them as a tool to control the "overall level of federal DSH funding state-by-state." *Virginia v. Johnson*, 609 F. Supp. 2d 1, 3 (D.D.C. 2009).

Second, Congress instructs HHS to monitor and limit hospital-specific reimbursements. Specifically, states may not seek DSH reimbursement for in-state hospital services where such funding would exceed "the costs incurred during the year of furnishing

3

hospital services (as determined by the Secretary and net of payments under this subchapter, other than under this section, and by uninsured patients)...for services provided during the year." 42 U.S.C. § 1396r-4(g)(1)(A). These are hospital-specific limits on federal DSH reimbursement, and Congress enacted them in an effort to address the chronic over-payment problem in which matching funding for DSH services would exceed the "net costs, and in some instances the total costs, of operating the facilities." Omnibus Budget Reconciliation Act of 1993, H.R. Rep. No. 103-111, at 211–12 (1993). In addition to these two requirements, Congress also requires generally that states operate their state plans in compliance with the Medicaid Act and implementing regulations. *See* 42 U.S.C. §§ 1396a, 1396r-4; 42 C.F.R. § 430.10.

## II.   Procedural History

On August 20, 2015, CMS disallowed $40,830,020 in federal funding to Virginia for DSH payments made in 2010 and 2011.[1] Administrative Record ("R.") 192–98. Virginia originally applied for FFP by submitting a Quarterly Statement of Expenditures (or "CMS-64") for payments made in quarters ending in June 30, 2010; September 30, 2010; September 30, 2011; and December 31, 2011. R. 137–38. According to a letter submitted on January 6, 2011 by the Director of the Department of Medical Assistance Services—the state agency administering the DSH payments—these payments actually accrued during 2006, 2007, 2008, and 2009. *See* R. 292–93. On its Quarterly form, too,

---

[1] The Court understands that, due to a later reimbursement by HHS of roughly $10 million, the parties agree that the amount in controversy is $30,027,540. *See* Pl.'s Mot. at 10 n.7.

4

Virginia documented several allotments, and included the allotment year to which each requested DSH disbursement applied. R. 258–59. Virginia also included an internal spreadsheet showing the relationship of payments to indigent care costs in a given year. *See* Pl.'s Mot. at 10–11 (characterizing spreadsheet at R. 277–80).

After considering Virginia's full submission, CMS denied Virginia's claimed FFP funds, reasoning that Virginia had improperly counted DSH disbursements for one fiscal year against indigent care costs in another fiscal year, and had thus violated federal regulations by failing to "allocate[] to the time periods in which DSH-eligible costs were incurred by the hospitals in providing certain services." R. 196. In other words, Virginia was counting costs in one year towards allotments in another, and thereby circumventing annual federal limits on DSH disbursements. CMS cited specific examples:

> [T]he State was not allocating payments to the proper DSH FY allotment. As noted above, payments for FY 2004 costs were applied against the FY 2006 and FY 2009 DSH allotments; payments for FY 2005 costs were applied against the FY 2006 DSH allotment; payments for FY 2008 costs were applied against the FY 2006, FY 2007, FY 2009 and FY 2010 allotments; and payments for FY 2009 costs were applied against the FY 2008, FY 2011, and FY 2012 allotments.

R. 195.

Agency procedure calls for an appeal to the Departmental Appeals Board ("DAB" or "the Board"), which provides the final level of review within HHS, subject to judicial review. *See* 42 C.F.R. § 430.42; *cf. id.* § 405.1877(a)(4) (explaining that where the Administrator sets forth a final decision, only that decision is subject to judicial review, not the agency decision below which was reversed, affirmed, or modified by the Administrator). The disallowance was upheld by the Board on August 8, 2016. *See* Defs.'

5

Mot. at 2; R. at 1. Like CMS, the Board concluded that Virginia's method for allocating payments to an allotment year was "inconsistent with the federal limitations on DSH spending." *See* R. 1. The opinion additionally observed that Virginia had itself "previously argued that the process of matching DSH payments to the state DSH allotment applicable to the year in which services were performed was not only permissible, but required under its state plan." R. 11–12. Thus, the Board agreed with CMS that "Virginia's approach was not reasonable because it allowed 'for a constructive end-run around the state and hospital-specific limits imposed by Congress.'" R. 17 (quoting CMS Br. at 17). The Board's decision reaffirmed the authority and prerogative of HHS to administer Medicaid funds, and process DSH reimbursement, so as to assure no hospital in a given fiscal year would be reimbursed in any amount that exceeded the costs incurred by that hospital during the same fiscal year. R. 17.

Virginia filed this suit on October 7, 2016 as permitted by the Medicaid statute. *See* 42 C.F.R. § 430.38 (affirming the right to judicial review of federal disallowances of Medicaid payments). After several extensions of the briefing schedule, Virginia filed its motion for summary judgment on November 30, 2017, seeking reversal of the Board's decision, and HHS filed its cross-motion for summary judgment on January 19, 2018. Here, I review the Board's decision. After considering the briefs and relevant portions of the administrative record, I conclude for the following reasons that the Board's decision, and the Government's interpretation of the statutory scheme, was well within the bounds of discretion afforded by law.

## ANALYSIS

I.  **Standard of Review**

Summary judgment "'is an appropriate procedure for resolving a challenge to a federal agency's administrative decision when review is based upon the administrative record,'" as it is here. *Bloch v. Powell*, 227 F. Supp. 2d 25, 30–31 (D.D.C. 2002) (quoting *Fund for Animals v. Babbitt*, 903 F. Supp. 96, 105 (D.D.C. 1995)). In such cases, the district court "sits as an appellate tribunal" and "the entire case…is a question of law." *American Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001) (internal citations omitted). Judicial review of a final determination rendered by a federal agency generally is governed by the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.* ("APA"). Courts will thus defer to the agency's "findings of fact if they are supported by substantial evidence and the [agency's] other findings and conclusions if they are not arbitrary, capricious, an abuse of discretion, or contrary to law." *Montgomery Kone, Inc. v. Sec'y of Labor*, 234 F.3d 720, 722 (D.C. Cir. 2000) (internal quotation marks omitted); *see also* 5 U.S.C. § 706(2)(A).[2]

In reviewing the Board's decision under the APA, I must apply the two-step

---

[2] Our Circuit has observed that "[w]hen the arbitrary or capricious standard is performing that function of assuring factual support, there is no *substantive* difference between what it requires and what would be required by the substantial evidence test, since it is impossible to conceive of a 'nonarbitrary' factual judgment supported only by evidence that is not substantial in the APA sense …." *See Ass'n of Data Processing Serv. Organizations, Inc. v. Bd. of Governors of Fed. Reserve Sys.*, 745 F.2d 677, 683–84 (D.C. Cir. 1984). I thus review questions of law and fact together for whether or not the Board's decision was reasonable.

framework set out in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984); *Va. Dep't of Med. Assistance Servs. V. U.S. HHS*, 678 F.3d 918, 921 (D.C. Cir. 2012).³ First, I must ask whether "Congress has directly spoken to the precise question at issue," and, if so, "give effect to Congress's unequivocal intent." *Chevron*, 467 U.S. at 842–43. Second, if the statute "is silent or ambiguous with respect to the specific issue," I must determine "whether the agency's [interpretation] is based on a permissible construction of the statute," giving "considerable weight" to the agency's interpretation. *Id.* at 843. Virginia challenges HHS's decision under both prongs of *Chevron*. First, Virginia calls HHS's determination "bogus" and "antithetical to the statute and implementing regulations." Pl.'s Mot. at 12. Second, Virginia challenges HHS's denial as arbitrary and capricious because it (i) failed to defer to Virginia's interpretation of its State Plan and (ii) departed from prior HHS practice. *See* Pl.'s Mot. at 15–20. I disagree as to both.

## II. The Board's Interpretation Was Not Contrary to Law

I first turn to whether Congress's intent emerges clearly from the wording of the Medicaid statute. At the outset, it is worth noting that the parties dispute the plain meaning of statutory language surrounding Congress's restrictions on DSH disbursements. Specifically, the parties contest whether the text mandates that DSH reimbursements in any

---

³ Plaintiff's assertion that *Chevron* deference should not be accorded laws promulgated under the Spending Clause, *see* Pl.'s Opp. To Defs.' Mot. [Dkt. # 28] at 5–6, has no strong support and is contravened by years of practice in this Circuit. *Friedman v. Sebelius*, 686 F.3d 813, 818 (D.C. Cir. 2012) (citing *Sullivan v. Everhart*, 494 U.S. 83, 88–89 (1990)) (both applying *Chevron* deference in reviewing HHS's interpretation of the Social Security Act). Thus, I reject plaintiff's argument.

given fiscal year cover only those specific services provided in that fiscal year, and thus match only those costs actually and effectively incurred in that fiscal year.

Plaintiff contends that "Congress *plainly* required DSH payments to be associated with allotment years," Pl.'s Mot. at 13–14 (emphasis added), by which it means Congress expressly allowed State Plans to employ DSH funding formulas of the type Virginia relied on in making its request for reimbursement in this case. HHS argues just the opposite; that is, that Congress intended to link hospital-specific limits to "the costs incurred by the hospital...during that year." Defs.' Mot. at 4, 14 (quoting 42 U.S.C. § 139r-4(g)), thus necessitating its disallowance of reimbursements which would, under Virginia's State Plan, have matched costs incurred in a separate fiscal year. One interpretation allows states to treat costs as fungible and recordable across years, and the other insists that Congress has sought to *prohibit* that as a matter of cost control. Both, of course, cannot be *plainly* reflected in the words of the statute. And, yet, neither interpretation is facially implausible. Discerning Congress's intent here is difficult; the only plain thing about this dispute is that it will not be resolved at *Chevron's* first step. The language of the statute is ambiguous enough regarding whether states must match costs to allocation on an annual basis that the Board's decision must be reviewed for its reasonableness, and with careful regard for the broad agency discretion afforded under *Chevron* step two.

### III. The Board's Interpretation Was Reasonable

Both parties agree that Congress entrusted the administration of the Medicaid statute to HHS, and therein empowered it to manage both the overall funds distributed to each state pursuant to Congress's limits on annual disbursements (state allotment) and

9

Congressional limits on each hospital's disbursement (hospital-specific limit). Courts must defer to an agency's interpretation of a statute so long as it is "rational and supported by the record." *Oceana, Inc. v. Locke*, 670 F.3d 1238, 1240 (D.C. Cir. 2011); *see also Chevron*, 467 U.S. at 844 (courts give "considerable deference" to an agency's statutory interpretation). Furthermore, it is also well-established that "an agency's interpretation of one of its own regulations commands substantial judicial deference." *Drake v. FAA*, 291 F.3d 59, 68 (D.C. Cir. 2002) (citing *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410 (1945)). Importantly, I need not decide whether HHS's interpretation was the *only* plausible reading of the relevant statutory language; merely whether it was a reasonable one. *See Chevron*, 467 U.S. at 842–45; *K N Energy, Inc. v. F.E.R.C.*, 968 F.2d 1295, 1299–1300 (D.C. Cir. 1992) ("Our role is not to ensure that [the agency's] reading is the most natural or the most logical, but only that it is 'reasonable and consistent with the regulation.'") (quoting *National Trust for Historic Preservation v. Dole*, 828 F.2d 776, 782 (D.C. Cir. 1987)).

Virginia argues that Board's finding imposes a "fourth requirement" on state plans that is in neither the statute and regulations, nor the Board's prior precedent vis-à-vis Virginia's State Plan. Pl.'s Mot. at 1. According to Virginia, HHS's interpretation was unreasonable because Virginia's allocation of payments under its State Plan is explicitly authorized by the Medicaid regulations:

> If a State's actual DSH expenditures applicable to a Federal fiscal year are less than its final State DSH allotment for that Federal fiscal year, the State is permitted, to the extent allowed by its approved State plan, to make additional DSH expenditures applicable to that Federal fiscal year up to the amount of its final DSH allotment for that Federal fiscal year.

10

Pl.'s Mot. at 20 (quoting 42 C.F.R. § 447.297(d)(3)).

HHS, for its part, argues that the Medicaid statute and regulations require a relationship between the fiscal year in which the costs were incurred and the fiscal year in which the allocation is made. Because the hospital-specific limit was designed to cap yearly payments per hospital, the arguments goes, "the State payment methodology cannot be administered in such a way as to potentially thwart the clearly stated purpose of the hospital-specific limits." Defs.' Mot. at 14. The Board's decision explains that Virginia's calculation method risks making an end-run around federal spending limits on Medicaid and that CMS's disallowment was based squarely in the state's violation of those limits. *See* Defs.' Mot. at 13 (citing R. 16–17).

While far from clear, it does appear that Congress framed both the state allotment and hospital-specific limit provisions as an annual limit of sorts. 42 U.S.C. § 1396r-4(f)(1) (capping the "allotment for the State for the fiscal year"); 42 U.S.C. § 1396r-4(g)(1)(A) (prohibiting hospital disbursements in excess of "the costs incurred during the year of furnishing hospital services…for services provided during the year."). Indeed, HHS's regulations are more explicit, making reference to both "expenditures" and "allotment[s]" within a "Federal fiscal year." 42 C.F.R. § 447.297(d)(3). Here, the Board concluded that Congress's statutory aim of limiting annual DSH funding could only be accomplished if there was some relationship between allocation and costs in a given fiscal year. As such, when it came to Virginia's allocation of Medicaid funds one year to the next, costs are not treated as fungible, and a formal yearly matching between expenditure and reimbursement

11

is not optional. That interpretation was reasonable, even if not the only compelled.[4]

As a secondary challenge, Virginia also argues that the Board's decision "departed" from one of its 2002 decisions, as well as from preamble language to a 2008 rulemaking addressing DSH audits. Pl.'s Mot. at 17, 22. In that 2002 holding, the Board upheld Virginia's interpretation of its own State Plan to allow DSH payments to be made in "on a quarterly basis" in and beyond the fiscal year to which the costs applied. *See Virginia Department of Medical Assistance Services*, DAB No. 1838, 2002 WL 2031569 (2002). HHS's departure from this precedent, asserts Virginia, is arbitrary and capricious.

Virginia's argument, however, is on doubly-shaky ground. First, the current Board decision is at least consistent—if not perfectly harmonious—with its prior decision upholding Virginia's practice of making payments in installments. In fact, Virginia's application for FFP DSH payments in this case requested federal funding for four installments over a two-year period: June 30, 2010; September 30, 2010; September 30, 2011; and December 31, 2011. R. 4, 196. As such, the Board took no issue with Virginia's "prospective" payment methodology. Defs.' Mot. at 14–15. The issue here instead was that Virginia's payments in 2010-2011 related to costs incurred in *prior* years, all the way back to 2006. *See* R. 6.

---

[4] Take a simplified example: in year one, Virginia DSH facilities incur costs of "4", and then in year two, costs of "8". Now, imagine a state-specific allotment cap of "6" for reimbursement. Naturally, Virginia would like an effective "credit" for its unused reimbursement capacity of "2" from year one, and would like that credit applied in year two, where the state is over its allotment. That makes some sense, given that HHS will not exceed overall spending limits for the two-year period. But it also frustrates HHS's goal of controlling costs on a year-by-year basis.

As to the 2008 rulemaking preamble, Virginia cites CMS's refusal to add language tying DSH payments directly to services rendered in a given fiscal year. Virginia argues, effectively, that the Board's hands are now bound, and that HHS may no longer insist that annual payments relate to annual costs. Pl.'s Mot. at 17 (citing 58 Fed. Reg. at 43,177). The Board explicitly considered the 2008 rule, *see* R. 15–16, but concluded that "[t]he fact that DSH payment adjustment is not calculated based on, or directly incorporated in, the standard rates billed and paid for day-to-day services does not mean that the DSH payments bear no relationship to the costs incurred by the hospitals in a fiscal year." R. 16.

Virginia does not, and cannot, challenge the fact that the Board carefully considered and analyzed the statute and regulations, Virginia's State Plan, and even its own prior practice in considering the claims at issue here. The Board explicitly considered, discussed, and reconciled each of these things. Nor am I swayed that the Board failed to properly defer to Virginia's interpretation of its own State Plan. *See* Pl.'s 21–24. Plaintiff's citations on this point are weak at best. *See* Pl.'s Mot. at 21 (quoting a 1988 Board decision and 1975 Ninth Circuit case). While it is clear that Congress provides the states flexibility as part of the overall Medicaid scheme, *see* 42 C.F.R. § 430.10, it is, nonetheless, axiomatic that the federal government may attach conditions to the disbursement of federal matched funds so long as those conditions are unambiguous. *See Arlington Cent. Sch. Dist. Bd. Of Educ. V. Murphy*, 548 U.S. 291, 296 (2006). Here, the Board appropriately considered Virginia's role in deciding on a disbursement methodology, but found that methodology at odds with the federal limits on overall DSH spending. As defendants put it, "[w]hile the hospital-specific limit does not supplant a

13

State's payment methodology, the State payment methodology cannot be administered in such a way as to potentially thwart the clearly stated purpose of the hospital-specific limits." Defs.' Mot. at 14. Thus, I find that, far from imposing an illegitimate "fourth requirement," HHS's interpretation was merely a reasonable interpretation of the existing statutory scheme and was not arbitrary and capricious.[5]

## CONCLUSION

For the reasons outlined above, I find that defendants' disallowance of FFP was not contrary to law or arbitrary and capricious. Thus, for all of the reasons outlined in this Opinion, defendants' Motion for Summary Judgment [Dkt. #24] is GRANTED and plaintiff's Cross-Motion for Summary Judgment [Dkt. #22] is DENIED. HHS's decision is upheld.

*[signature]*
RICHARD J. LEON
United States District Judge

---

[5] Virginia also claims that the Board's interpretation was a "new rule" requiring notice and comment. Pl.'s Mot. at 17–18. Because I find that HHS's interpretation was instead a reasonable interpretation of *existing* regulations, I reject Virginia's argument that the lack of notice and comment was arbitrary and capricious.

14